IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| City of Houston, | § | |
| *Plaintiff,* | § | |
| v. | § | Case No. _____ |
| Towers Watson & Co., | § | Jury Demanded |
| *Defendant.* | § | |

Complaint

Plaintiff City of Houston (the "City") files this Complaint against defendant Towers Watson & Co. ("Towers").  Plaintiff demands a trial by jury.

Introduction

1.Each year the City of Houston pays more than $300 million to the three pension funds it supports for City firefighters, police officers, and municipal workers.  The City's contributions to these pension funds impose a substantial annual financial burden on the City and its taxpayers.  For the 2015 fiscal year, the City's required contribution to the firefighters' pension fund, the Houston Firefighters' Relief and Retirement Fund (the "Firefighters' Fund"), alone will exceed $90 million.  The City's contribution equals approximately 33.2% of the fire department's annual payroll, and is approximately four times the amount that the firefighters themselves contribute from their salaries.  It was not always thus.

2.As of early 2000, the City's contribution to the Firefighters' Fund was holding steady at the statutory minimum of 15.4% of the fire department's annual payroll, and was equal to exactly twice the amount that the firefighters themselves contributed from their salaries.  In 2000, defendant Towers – one of the largest actuarial firms in the country – conducted an annual actuarial valuation of the Firefighters' Fund, just as Towers had done for years.  In its February 2000 report, Towers represented that the Firefighters' Fund was running a surplus, and Towers

represented that the City's minimum contribution percentages would remain in place through at least 2018. At the time it issued its February 2000 report, Towers was the long-time principal actuary for the firefighters' pension fund and Towers knew that its annual actuarial valuation report was the sole basis for determining how much money the City would be required to contribute to the pension fund every year. Towers knew that tens of millions of dollars per year of the City's tax dollars depended on Towers professionally, competently, and honestly performing its actuarial work.

3. In April 2000, Towers issued another report in which it, this time, represented that the City's firefighters could increase their existing pension benefits and add attractive new benefits all, Towers said, without increasing the financial burden on the City and without increasing the City's rate of annual contributions to the Firefighters' Fund. Towers knew and intended that the City would rely – indeed would have to rely – on Towers' actuarial work to assess the costs of the proposed benefit changes as well as the impact those changes would have on the City's annual contributions. In reliance on Towers' actuarial work, the City supported the new benefit package and the firefighters adopted the changes.

4. Through its negligence, Towers grossly underestimated and misrepresented the cost of the pre-existing benefits and also grossly underestimated and misrepresented the cost of the new benefits adopted in mid-2000. Towers' unprofessional, negligent, and below-the-standard-of-care actuarial work is the root cause of the pension funding crisis now facing the City of Houston.

5. Towers' failure to comply with the standards and practices required of professional actuaries was particularly damaging because the City (and the Firefighters' Fund) did not have the years of specialized training and detailed knowledge of actuarial science that

Towers claimed to have and that was necessary properly to assess the actuarial impacts of the benefit changes under consideration.  As a matter of fact and Texas law, the City justifiably had to and did rely on Towers competently to assess the financial condition of the Firefighters' Fund and the costs of the new proposed and then adopted benefits.  Towers' negligence is directly responsible for the adoption of the 2000 benefit changes and for the resulting current and future massive financial drain on the City of Houston and its taxpayers.

## Parties

6. The City is a home rule municipal corporation, established by and functioning under its City Charter with its principal place of business in Houston, Harris County, Texas.  As a core part of its governmental functions, the City operates the Houston Fire Department for the safety of its more than two million resident citizens and their property, and employs over 3,800 firefighters.

7. Towers is a global actuarial services company incorporated in the State of Delaware, has its global headquarters at 875 Third Avenue, New York, New York 10022, and does business in Harris County, Texas.  Towers may be served with process and a copy of this Complaint by serving its registered agent for service of process at National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904.  Towers (and its predecessor Towers, Perrin, Forster & Crosby Inc.) maintained an office in Houston, Texas at all times relevant to this lawsuit, and maintains an office in Houston today at 1221 McKinney, Houston, Texas 77002.

8. On January 1, 2010, Towers, Perrin, Forster & Crosby Inc. and Watson Wyatt Worldwide Inc. merged to form Towers.  According to Towers' 2013 Form 10-K, Towers staff includes "fully accredited actuaries, [who] are trusted advisors and experts in their fields."

According to Towers' website, Towers' "focus is on giving you the clarity to make the right decisions and take the right actions. And our approach is grounded in perspective – the kind that comes from our deep experience working on a wide range of issues." In 2013, Towers had revenues of approximately $3.6 billion.

## Jurisdiction and Venue

9. This Court has subject matter jurisdiction under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10. This Court has personal jurisdiction over Towers because this action arose from, and is connected with, Towers' purposeful acts committed in Texas. Towers has continuous and systematic activities in the State of Texas and maintains multiple offices in Texas, including in Houston. Towers directly and intentionally transacted business in this district with respect to the matters at issue in this lawsuit. A substantial part of the events giving rise to and at issue in this lawsuit occurred in this district.

11. Venue in this district is proper under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this lawsuit occurred in this district.

## Facts

12. The Houston Firefighters' Relief and Retirement Fund (the "Firefighters' Fund") is a public retirement system created by Tex. Rev. Stat. article 6243e.2(1), *et seq.* (the "Statute"). The Statute establishes a pension fund "in each incorporated municipality that has a population of at least 1,600,000 and a fully paid fire department." Sec. 6243e.2(2). The City of Houston is the only municipality in Texas fitting this description and thus the only city subject to this

Statute. The Firefighters' Fund serves as the pension plan for approximately 6,600 current and retired Houston firefighters. As of May 2014, the Firefighters' Fund has $3.8 billion in assets.

13. The Statute provides in § 2 that the Firefighters' Fund is managed by a ten person board of trustees with eight trustees elected or appointed by the firefighters, and the other two trustees positions held by the City of Houston's Treasurer and by an appointee of the Mayor of Houston.

14. The Firefighters' Fund is financed by contributions from active firefighters and from the City. The Statute requires that active firefighters contribute a fixed percentage of their salary, currently 9%. The Statute requires at § 13(d) that the City contribute the entire amount needed to cover the cost of benefits paid during the current year (the "normal cost") plus an amortized portion of any unfunded liability. The Statute provides for a minimum contribution from the City, and requires that the City's annual contribution must be at least twice the firefighters' contribution, regardless of the normal cost and any unfunded liability. Beyond this statutory minimum of twice the firefighters' contribution, the City's contribution can increase above this minimum without any upper limit if the cost of benefits and/or amortization payment towards the unfunded liability increase.

15. The City's annual contribution to the Firefighters' Fund is determined entirely by an actuary hired by the Firefighters' Fund. The Statute requires the Firefighters' Fund to retain an actuary to perform a valuation that will determine the City's required annual contribution. The Statute provides at § 3(d) that:

> The board may have an actuarial valuation performed each year, and for determining the municipality's contribution rate as provided by Section 13(d) of this article, the board may adopt a new actuarial valuation each year, except that an actuarial valuation that will result in an increased municipal contribution rate that is above the statutory minimum may be adopted only once every three years,

unless the governing body of the municipality consents to a more frequent increase.

16. The Statute places the actuary in the key role of determining how much money the municipality (the City of Houston) must contribute to the Firefighters' Fund each year. Further, Section 10 of Statute assigns the actuary the key role in determining whether the Firefighters' Fund can change its members' benefits, which only can be increased if:

(1) an actuary selected by the Fund determines that a proposed benefit increase cannot reasonably be viewed as posing a material risk of jeopardizing the Fund's ability to pay any existing benefit;

(2) a majority of the current and retired firefighters vote for the benefit increase;

(3) the increase does not deprive a member of a right to receive an existing benefit; and

(4) the Pension Review Board approves the determination of the actuary selected by the Fund.

17. The Statute highlights the importance of having an actuary that performs high quality work that meets professional standards because, per § 10(1), benefits can be increased only if "an actuary selected by the board, who, if an individual is a Fellow of the Society of Actuaries, a Fellow of the Conference of Actuaries in Public Practice, or a member of the American Academy of Actuaries determines that the increase cannot reasonably be viewed as posing a material risk of jeopardizing the Fund's ability to pay any existing benefit."

18. For nearly twenty years from the early 1980s until 2002, Towers' predecessor firm Towers Perrin was the actuary selected by the Firefighters' Fund. Towers prepared annual actuarial valuations of the Firefighters' Fund's assets and liabilities, and Towers calculated the City's required annual contributions.

19. According to Towers, the Firefighters' Fund was running a surplus through the late 1990s. To that end, Towers represented that the actuarial value of the Firefighters' Fund's assets exceeded the accrued liability for benefits payable to pension members over the next 30 years.

20. In February 2000, Towers issued its "Actuarial Report as of July 1, 1999." Towers reported that the Firefighters' Fund had a surplus, and reported that the City's contribution for fiscal year 2000 would be the minimum amount required by the Statute. The firefighters' payroll contribution at that time was 7.7% of their salary and only an additional 13.7% of payroll was necessary for full funding, so Towers determined that the City's statutorily-required, at-least-twice minimum contribution of 15.4% of payroll (7.7% * 2) would be the City's contribution for fiscal year 2000. In its February 2000 report, Towers represented that the City's annual contribution would remain at this statutory minimum of 15.4% amount through at least 2018, the last year identified in Towers' report.

21. Towers grossly and negligently miscalculated the cost of the Firefighters' Fund's existing benefits, and Towers misrepresented the amount of the City's contribution for the coming years. In reliance on Towers' misrepresentations and miscalculations that the Firefighters' Fund was running and would continue to run a surplus, the Firefighters' Fund considered increasing existing benefits for retirees and adding new benefits.

22. On April 17, 2000, Towers released a special report titled "Actuarial Analysis of Proposed Benefit Changes Under Section 10 of the Governing Statute" in which Towers assessed the proposed benefit increases and misrepresented that the proposed benefit changes only would increase the City's responsibility for "normal cost" from 13.7% of payroll to 15.2% of payroll. Towers reasoned in its report that the City's 15.2% payment for "normal cost" still

would be less than the City's statutorily required minimum of 15.4%. Towers misrepresented that the existing benefits could be increased and the new benefits could be added without increasing the City's contribution rate for the next 10 years, which was as far as Towers calculated in its special report.

23. On May 5, 2000, the Firefighters' Fund sent Towers' special report to the Pension Review Board which, as required by the Statute, held a hearing on the proposed benefit changes on May 22, 2000. The minutes of that hearing reflect that a representative of the City attended the hearing and, based on Towers' representation that the enhanced benefit proposal could be fully funded without increasing the City's contribution above the minimum required by the Statute, supported the benefit changes. The minutes note that the City representative expressed that the City was confident it could "fund any increase that might reasonably be expected to result."

24. The minutes of the May 22, 2000 hearing show that, like the City, the Pension Review Board relied on Towers' work and representations to approve the benefit changes. The minutes show that the Pension Review Board noted that Towers "was held in high esteem in the actuarial community" and that "the actuarial methods, actuarial assumptions, and the procedures for selecting these assumptions would all be found consistent with existing actuarial standards." Based on Towers' special report, and the City's support of the proposed benefit changes which itself was based on Towers' representations and advice, the Pension Review Board approved the increased benefits.

25. In March 2002, Towers issued its annual valuation in a report titled "Actuarial Report as of July 1, 2001." With over a year's worth of experience with the enhanced benefits, Towers' March 2002 report calculated that the normal cost of benefits increased to 22.3% of

payroll – a dramatic 47% increase over the 15.2% that Towers had misrepresented in its April 2000 special report.  Because the fire department's 2002 payroll was $164 million, the increase from approximately 15% (which Towers falsely had represented) to 22.3% (the reality just over a year later) meant that the City's responsibility for "normal cost" jumped by an additional $11.6 million in a single year.  In stark contrast to Towers' representations in its April 2000 special report, Towers' March 2002 report represented that the increase in "normal cost" would persist through at least 2020 – which would result in an increased cost to the City of at least $11.6 million every year for over a decade to come.

26.  Implicitly recognizing the negligent and sub-standard work of its team of actuaries (and in recognition of the huge increase in "normal cost" to the City far above what Towers falsely had represented), Towers changed its team of actuaries responsible for the Firefighters' Fund, and Towers' new team of actuaries dramatically changed the calculations of liabilities performed by Towers' prior team of actuaries.

27.  In December 2002, Towers released its "Actuarial Report as of July 1, 2002" and a brand new set of actuaries signed the report for Towers.  These new Towers actuaries changed the several critical calculations (mis)performed by Towers' prior team of actuaries, including changing calculations of critical drivers of cost, such as calculations of how many firefighters would participate in the "DROP" benefit and calculations of how many firefighters would participate in the newly-enacted "BackDROP" benefit.  Towers' prior and now-displaced team of actuaries had ascribed no cost to the "BackDROP" benefits.  Towers' new team of actuaries altered Towers' prior team's calculations – essentially trying to correct Towers' own earlier mistakes – and, in doing so, increased the actuarial accrued liability by $163 million and thereby increased the City's required contributions.  Towers' attempt to correct its own prior multi-

hundred million dollar mistakes was too little and too late to remedy the enormous financial damage wrought by Towers' own prior negligence and misrepresentations.

28. Towers intended for its work, actuarial reports, and representations to be relied on by the City and the Firefighters' Fund's board of trustees, and they did rely on them. The City supported the benefit increase only because of, and in reliance on, Towers' representations and reports. The City would not have supported the benefit increase if Towers had not misrepresented the present and future financial condition of the Firefighters' Fund and the contributions that would be required by the City to support those benefits. The increased benefits would not and could not have been approved or enacted if Towers had acted competently and without negligence. Towers' negligence and misrepresentations damaged the City to the tune of tens of millions of dollars in annual contributions.

## Causes of Action

29. All conditions precedent for which the City might have any burden have occurred or have been waived or excused, or Towers is estopped from relying on their non-occurrence.

## Count 1 – Negligence and Negligent Misrepresentation

30. The City incorporates the allegations above.

31. Towers negligently misrepresented that its work concerning the financial condition of the Firefighters' Fund, the cost of benefits provided by the Firefighters' Fund, the assets and liabilities of the Firefighters' Fund, and the City's contributions to the Firefighters' Fund was done competently and in accordance with generally accepted actuarial principles and practices.

32. Towers negligently misrepresented that its work accurately and fairly presented the actuarial position of the Firefighters' Fund. Towers' misrepresentations included at least the following:

   a. That as of July 1, 1999, the Firefighters' Fund's surplus position was overstated and may not have been in surplus at all.

   b. That as of July 1, 1999, the City's required contribution for normal cost was 13.7% of payroll and decreasing from fiscal year 1998.

   c. That as of July 1, 1999, the City's actuarially determined contribution would be the statutory minimum through at least 2018.

   d. That as of July 1, 1999, the Firefighters' Funds' actuarially determined surplus would grow from year to year through 2018.

   e. That the proposed benefit changes would increase the City's required payment of normal cost from 13.7% of payroll to no more than 15.2% of payroll.

   f. That the proposed benefit changes would not increase the City's annual contribution above the statutory minimum of two times the firefighters' contribution from their salary.

   g. That even with the adoption of the proposed benefit changes, maintaining the City's contribution at the statutory minimum was sufficient to pay the normal cost of the Firefighters' Fund.

   h. That even with the adoption of the proposed benefit changes, maintaining the City's contribution at the statutory minimum was sufficient to fully amortize any actuarially accrued liability of the Firefighters' Fund over the appropriate period.

   i. That even with the adoption of the proposed benefit changes, if the City made only its statutory minimum contributions, the Firefighters' Fund would continue to be actuarially sound.

   j. That even with the adoption of the proposed benefit changes, the Firefighters' Fund would remain in surplus.

   k. That even with the adoption of the proposed benefit changes, no City contribution above 15.4% of payroll would be required for at least 10 years.

   l. That even with the adoption of the proposed changes, the surplus funding status of the Firefighters' Fund would be preserved by City annual contributions equal to 15.4% of payroll.

      m. That even with the adoption of the proposed benefit changes, if the firefighters voluntarily increased their payroll contribution from 7.7% to 8.1%, maintaining the City's contribution at the statutory minimum of two times the firefighters' contribution from salary would improve the funded status of the Firefighters' Fund over time.

33. Towers' misrepresentations were materially false. Towers would have and should have known that its representations were false if Towers had exercised reasonable care. Towers was required to (but did not) take reasonable care to ensure that its methods and representations were accurate and prepared in accordance with such skill, prudence, and diligence as other members of the actuarial profession commonly possess and exercise. Towers' negligence was gross negligence, particularly when viewed objectively from Towers' standpoint at the time of its acts and omissions because they involved an extreme degree of risk considering the probability and magnitude of the potential harm to the City and others, and because Towers had actual, subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights or welfare of the City and others.

34. The City reasonably and justifiably relied on Towers' misrepresentations and negligent advice.

35. As a direct, proximate, and foreseeable result of Towers' negligent misrepresentations, the City has suffered (and will continue to suffer) substantial actual damages. The City also seeks and is entitled to exemplary damages.

Count 2 - Negligence and Professional Malpractice

36. The City incorporates the allegations above.

37. Towers owed the Firefighters' Fund and the City a duty to use such skill, prudence, and diligence as other reasonable and prudent actuaries would use in similar circumstances. This duty encompassed Towers' work and reporting concerning the financial

condition of the fund, the actuarial costs of existing and future benefits, and the City's contributions.

38. Towers engaged in negligence and professional malpractice by breaching its duties through its numerous and persistent errors and failures to act in accordance with its professional responsibilities, including but not limited to (a) advising that the City's firefighters could increase existing pension benefits and add new benefits without increasing the financial burden on the City and without increasing the City's annual contributions to the Firefighters' Fund above the minimum requirement, (b) failing to develop and provide accurate and reasonable short- and long-term cost estimates of existing and proposed benefits, (c) negligently advising that the proposed benefits would not increase the City's annual contribution rate, (d) failing to assess and explain the short and long-range cost and retirement and other behavioral impacts of proposed benefits, and (e) failing to adhere to actuarial standards of practice in communicating Towers' projected cost of existing and proposed benefits.  Towers' negligence was gross negligence, particularly when viewed objectively from Towers' standpoint at the time of its acts and omissions because they involved an extreme degree of risk considering the probability and magnitude of the potential harm to the City and others, and because Towers had actual, subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights or welfare of the City and others.

39. The City reasonably and justifiably relied on Towers' misrepresentations and negligent advice.

40. As a direct, proximate, and foreseeable result of Towers' negligence and breaches of its duties, the City has suffered (and will continue to suffer) substantial actual damages.  The City also seeks and is entitled to exemplary damages.

Jury Demand

41. The City requests a jury trial in this action.

Relief Sought

42. The City respectfully requests that this Court enter judgment in favor of the City and against Towers, and award the City actual damages, exemplary damages, special damages, attorney's fees and expenses, costs of suit, pre- and post-judgment interest at the maximum legal rate, and all such other and further relief, equitable and legal, to which the City justly is entitled.

Dated: August 1, 2014

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: /s/ *Geoffrey L. Harrison*
Geoffrey L. Harrison
Attorney-in-charge
State Bar No. 00785947
S.D. Adm. #16690
gharrison@susmangodfrey.com
James T. Southwick
State Bar No. 24001521
S.D. Adm. #21854
jsouthwick@susmangodfrey.com
Alex Kaplan
State Bar No. 24046185
S.D. Adm. #602421
akaplan@susmangodfrey.com
Abigail C. Noebels
State Bar No. 24083578
S.D. Adm. # 2209468
anoebels@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

*Attorneys for Plaintiff City of Houston*